IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 05-cv-02203-PAB-BNB

KEVIN LAVENT BROWN,

Plaintiff,

v.

H.S.A. SANDY HARRIS,
P. A. GREG ROBINSON,
P. A. CHRISTINE MILLER,
ASST. WARDEN RANDY FOSHEE,
MJR. LINDA MAYFIELD,
CAPT. ELOY JARAMILLO,
LT. MIKE TRITZ, and
WARDEN JAMES ABBOTT,

Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

This matter is before me on the **Defendants' Motion for Summary Judgment** [Doc. #199, filed 3/14/08](the "Motion"). The plaintiff did not file a response to the Motion.[1] For the following reasons, I respectfully RECOMMEND that the Motion be GRANTED and that summary judgment enter in favor of the defendants on all of the plaintiff's claims.

---

[1]On April 3, 2008, I ordered the plaintiff to respond to the Motion on or before April 17, 2008 [Doc. #201]. At that time, the plaintiff was not incarcerated. Therefore, he was ordered to respond within a two week period. On July 30, 2008--more than three months after his response was due--the plaintiff sought an indefinite extension of time to respond to the Motion [Doc. #207]. I denied the plaintiff's request because he did not specify the length of time he needed and he did not satisfy the requirements of Rule 56(f), Fed.R.Civ.P. The plaintiff did not seek any further extensions of time to respond.

# I.  STANDARD OF REVIEW

As a preliminary matter, I must liberally construe the pleadings of a *pro se* plaintiff. Haines v. Kerner, 104 U.S. 519, 520-21 (1972).  I cannot act as advocate for a *pro se* litigant, however, who must comply with the fundamental requirements of the Federal Rules of Civil Procedure.  Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the party opposing the motion and that party must be afforded the benefit of all reasonable inferences to be drawn from the evidence.  Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  Rule 56(c), Fed.R.Civ.P., provides that summary judgment should be rendered if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, discovery, disclosures, and affidavits the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 447 U.S. 317, 323 (1986).  The party opposing the motion is then required to go beyond the pleadings and designate specific evidence showing that there is a genuine issue for trial.  Id. at 324.  Only admissible evidence may be considered when ruling on a motion for summary judgment.  World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985).

# II.  BACKGROUND

The plaintiff initiated this action on October 21, 2005 [Doc. #1]. At that time, the plaintiff was incarcerated by the Colorado Department of Corrections ("DOC") at the Colorado Territorial Correctional Facility ("CTCF").

The initial Prisoner Complaint was filed on November 2, 2005 [Doc. #3]. The plaintiff was granted leave to file an Amended Complaint on February 22, 2007 [Doc. #99]. The Amended Complaint (the "Complaint") asserts two claims [Doc. #100]. Claim One alleges violations of the plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. Claim Two alleges that defendants Harris and Miller retaliated against the plaintiff for exercising his constitutional right to file this action. The plaintiff is suing the defendants in their individual capacities. *Complaint*, p. 4-C.

### III. UNDISPUTED MATERIAL FACTS

Because the plaintiff did not file a response to the Motion, the undisputed material facts are taken from the defendants' Motion. I am aware that the allegations of the plaintiff's Complaint are sworn under penalty of perjury. *Complaint*, p. 8. Under C.D. Mosier v. Maynard, 937 F.2d 1521, 1524 (10th Cir. 1992), a plaintiff's complaint may be treated as an affidavit under Fed.R.Civ.P. 56(e) to the extent it contains statements that are based on personal knowledge and those statements have been sworn under penalty of perjury. However, because the plaintiff did not file a response to the Motion, he has not provided the Court with any specific citations to factual statements made in the Complaint. The Complaint includes allegations on twenty-four single-spaced, typewritten pages. It is not a judicial function to scour the Complaint for statements that are based on personal knowledge and which might rebut the defendants' statement of undisputed facts. See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1546 (10th

Cir. 1995). It is the litigants' responsibility to provide the court with concise arguments, relevant facts, and specific citations to authorities and supporting evidence. Toth v. Gates Rubber Co., 2000 WL 796068, *8 (10th Cir. 2000). Indeed, the plaintiff was specifically ordered to file a response to the Motion which provides "specific references to material in the record" which support his factual statements [Doc. #167].

Moreover, failure to file a response within the time specified results in a waiver of the right to respond or to controvert the facts asserted in the summary judgment motion. Reed v. Bennett, 312 F.3d 1190, 1195 (10th Cir. 2002). Under these circumstances, the court accepts as true "all material facts asserted and properly supported in the summary judgment motion. But only if those facts entitle the moving party to judgment as a matter of law should the court grant summary judgment." Id.

The following material facts are undisputed :

1.    The plaintiff has been diagnosed with HIV/AIDS and degenerative arthritis of the left hip. *Motion*, Ex. A-12, ¶¶ 16-17.

2.    In April 2005 the plaintiff began requesting a lower bunk restriction due to "left hip pain diagnosed as osteoarthritis." Id. at ¶¶ 18, 23.

3.    CTCF houses a large number of elderly, frail, and very sick inmates. There are a limited number of lower bunks available at CTCF. Lower bunks are in high demand. Id. at ¶ 19; Ex. A-14, ¶11. Approximately two to three times per year, Clinical Services at CTCF reviews the records of every inmate to determine which inmates require a lower bunk. Id. at Ex. A-12, ¶ 20. Inmates who do not medically require a lower bunk may have their cell and bunk assignment changed. Id.

4

4. Defendant Greg Robinson, a Physician's Assistant, reviewed the plaintiff's medical file and concluded that his medical condition did not meet the DOC's objective medical criteria for a lower bunk restriction. Id. at ¶¶ 23-25.

5. The objective criteria used by the DOC in evaluating requests for medical restrictions are based on nationally-recognized Milliman Care Guidelines. Id. at¶¶ 25-26.

6. Because Robinson did not believe that a lower bunk was a medical necessity for the plaintiff, id. at ¶¶ 25, 28, 30; Ex. A-8, Resp. No. 13, the plaintiff's previous lower bunk assignment was removed. Id. at Ex. 1 to Ex. A-12.

7. In June 2005, defendant Harris, Health Services Administrator for CTCF, received a letter from the plaintiff complaining of hip pain and requesting a lower bunk restriction. Ex. A-5, Resp. No. 1. Harris referred the letter to the medical clinic because it is not within the scope of her practice to make decisions regarding medical restrictions. Id.; Ex. A-12, ¶¶ 5, 41.

8. At various times in 2005, defendant Miller, a Nurse Practitioner, denied the plaintiff's requests for a lower bunk restriction because he did not meet the DOC's objective criteria for a lower bunk restriction and did not medically require a lower bunk restriction. Id. at Ex. A-13, ¶¶ 8, 10, 12.

9. On or about July 7, 2005, defendant Tritz, a Lieutenant at CTCF, received a letter from defendant Mayfield that was written by the plaintiff. Id. at Ex. A-2, Resp. No. 1-2. Mayfield asked Tritz to respond to the letter. Id. at Resp. Nos. 2-3. Tritz interviewed the plaintiff in his office. Id. at Resp. No. 3.

10. The plaintiff complained to Tritz about his hip and the problems he was having obtaining a medical restriction for a lower bunk. Id. at Resp. No. 7. Tritz contacted Clinical Services and learned that the plaintiff did not meet the criteria for a lower bunk restriction. Id.

11. Tritz informed Mayfield of his conversation with the plaintiff and with Clinical Services. Id. at Resp. No. 8.

12. Tritz did not place the plaintiff in a lower bunk or move him to Cell House 3 (which does not contain upper bunks) because the plaintiff did not have a medical necessity. Id. at Resp. No. 10.

13. On July 7, 2005, the plaintiff wrote a letter to defendant Foshee, the Associate Warden at CTCF, requesting placement in a lower bunk or a transfer to Cell House 3. Id. at Ex. A-9, Resp. Nos. 1-2; Ex. A-14, ¶ 3. At the request of defendant Abbott, Warden of CTCF, Foshee contacted defendant Harris about the plaintiff's request for a lower bunk restriction. Id. at Ex. A-14, ¶ 4.

14. Defendant Harris responded that the plaintiff had been evaluated numerous times, he did not currently meet the criteria for a lower bunk restriction, and therefore the plaintiff's request for a lower bunk was a housing/security issue, not a medical issue. Id.

15. Based on the information provided by Harris, Abbott wrote a memorandum to the plaintiff on July 29, 2005, which stated:

> After receiving your letter and kite, both dated July 7, 2005, CTCF
> Clinical Services was contacted about the medical restriction you
> claim to have had.
>
> According to the CTCF Health Service Administrator, you have
> been evaluated numerous times for lower-bunk restriction.
> However, you do not meet their guidelines or criteria for this

restriction at this time.  This is now a security and housing issue, not medical, based on you not meeting medical criteria.

Id. at ¶ 5.

16.    The determination of whether an inmate requires a medical housing restriction, such as a lower bunk restriction, is made by Clinical Services.  Only Clinical Services has the authority to issue medical restrictions.  Non-medical staff, including Warden Abbott, Associate Warden Foshee, Major Mayfield, Captain Jaramillo, and Lieutenant Tritz, do not have the power or authority to issue medical restrictions.  Id. at ¶¶ 6-7.

17.    On July 27, 2005, in response to a kite from the plaintiff "demanding to see orthopedics," Nurse Practitioner Connie Batson noted the following:

> [C]hart review indicates demands started when lower bunk was discontinued as [plaintiff] does not meet DOC criteria.  New x-ray of L hip shows [degenerative joint disease] - this is not a reason in itself for a lower bunk restriction.  Based on his multiple kites on this issue & my responses, I will have [plaintiff] scheduled to evaluate & determine if orthopedic appt is necessary.

Id. at Ex. 6 to Ex. A-12; Ex. A-12, ¶ 23.

18.    On July 29, 2005, Batson examined the plaintiff and submitted a referral for the plaintiff to see an orthopedic specialist.  Id. at ¶ 24.

19.    The plaintiff was scheduled for a medical appointment in the CTCF clinic on October 4, 2005, in response to a kite he submitted.  *Motion*, Ex. A-13, ¶ 27.  During this visit, defendant Miller told the plaintiff that he had an upcoming appointment with an orthopedic specialist.  Id.

20.    On October 26, 2005, the plaintiff was seen by Dr. Go, an orthopedic specialist at the Colorado Mental Health Institute at Pueblo ("CMHIP").  Id. at Ex. A-12, ¶ 43.  Dr. Go

recommended that the plaintiff receive an MRI, physical therapy, a lower bunk, and a second mattress.  Id.  Dr. Go also requested a follow up visit with the plaintiff after completion of the MRI.  Id.

21.   Pursuant to DOC policy, outside providers like Dr. Go cannot issue orders; they can only issue recommendations.  Id. at ¶ 44.  Such recommendations are then reviewed by a DOC medical provider to determine whether they will be adopted.  Id.

22.   On October 31, 2005, defendant Miller spoke with Dr. Go for the purpose of determining which medical treatments and restrictions were medically necessary for the plaintiff.  Id. at Ex. A-13, ¶ 32.  She made the following entry into the plaintiff's health record:

> Chart review for Step One Grievance. [Plaintiff] grieving that orders for lower bunk, second mattress, and MRI have been denied by DOC providers when ordered by Dr. Go at CMHIP 10/26/05.
>
> I spoke with Dr. Go 10/31/05 who stated that the only reason that a second mattress and lower bunk were ordered was because the [plaintiff] requested it.  DOC staff has the right to disregard outside provider orders if [t]hey are deemed medically unnecessary per DOC guidelines.

Id. at Ex. 16 to Ex. A-13 (emphasis added).

23.   On October 31, 2005, Miller denied the plaintiff's request for a lower bunk and second mattress because they were not medically indicated.  Id. at Ex. A-13, ¶ 33.

24.   During her conversation with Dr. Go, Miller advised the doctor that he needed to submit a specific request if he wanted the plaintiff to receive an MRI.  Id. at ¶ 34.  When reviewing the plaintiff's medical file on November 10, 2005, Miller noticed that Dr. Go had not requested the MRI pursuant to the new Physician Health Providers guidelines.  Id.  Miller therefore submitted the appropriate referral on that day.  Id. at ¶ 35.

25.    On November 29, 2005, the plaintiff and Miller were in the clinic hallway.  The plaintiff began yelling, "Don't go and see her.  She won't do anything for you."  The plaintiff was being disruptive and disrespectful.  Miller asked Correctional Officer Mindi Thompson to assist with the plaintiff.  Thompson asked the plaintiff to leave the clinic.  The plaintiff continued to yell as he left the clinic.  Id. at ¶ 39.

26.    On November 29, 2005, Miller wrote an incident report about the plaintiff's conduct.

27.    It is normal DOC policy for DOC staff to write an incident report whenever an inmate is disruptive and/or disrespectful.  Id. at ¶ 40; Ex. A-15, ¶ 5.

28.    Correctional Officer Thompson also wrote an incident report on November 29, 2005, which described the plaintiff's behavior.  Id. Ex. A-13, ¶ 41.

29.    The plaintiff was charged with a disciplinary violation as a result of his conduct on November 29, 2005.  Id. at ¶ 42.

30.    It was not Miller's decision to charge the plaintiff with a disciplinary violation.  Id. at ¶ 43.  Decisions regarding disciplinary charges are made by a Disciplinary Officer.  Id. at Ex. A-15, ¶ 8.  The Disciplinary Officer has the responsibility to determine whether an inmate's conduct merits a disciplinary charge and what, if any, disciplinary charge is appropriate.  Id.

31.    Lt. Robert Fazzino served as the Disciplinary Officer in this case.  Id. at ¶ 9.  Lt. Fazzino made the decision to charge the plaintiff with "Disobeying a Lawful Order."  Id.

32.    The plaintiff received a disciplinary hearing on December 19, 2005.  Id. at ¶ 10.  Lt. Ken Topliss, the Hearing Officer, found the plaintiff not guilty of "Disobeying a Lawful Order."

Id. at ¶ 11.  The Hearing Officer noted that "[t]he report reveals other COPD violations that may have been violated, however they were not the ones charged."  Id.; Ex. 4 to Ex. A-15.

33.    On December 1, 2005, Miller renewed the plaintiff's prescription for Megestrol, a medication to assist with weight gain due to his HIV/AIDS.  Id. at Ex. A-13, ¶¶ 62, 64.  She had personally approved his request for Megestrol several times in 2005 and 2006.  Id. at ¶ 62.

34.    Megestrol is not on the DOC's Formulary List of approved medications.  Id. at ¶ 63. All prescriptions for non-formulary medications must be approved by the DOC's Non-Formulary Committee.  Id.  At various times, the DOC's Non-Formulary Committee denied the plaintiff's request for Megestrol, usually because he was successfully maintaining an appropriate weight and the medication was not necessary at that time.  Id.

35.    The Non-Formulary Committee denied the plaintiff's request for Megestrol in December 2005 because his weight was at an appropriate level and the medication was not necessary.  Id. at ¶ 65.  Miller was not involved in the Non-Formulary Committee's decision to drop the plaintiff's Megestrol prescription in December 2005.  Id. at ¶ 66.

36.    The plaintiff received an MRI on December 19, 2005.  Id. at Ex. A-15, ¶ 36.

37.    Knowing that the plaintiff was scheduled for an MRI on December 19, 2005, Miller submitted a referral on December 12, 2005, for the plaintiff to receive a follow up appointment with Dr. Go.  Id. at ¶ 37.

38.    The plaintiff saw a physical therapist for his hip on December 22, 2005.  Id. at ¶ 38.

39.    On March 15, 2006, the plaintiff attended a follow up visit with Dr. Go.  Id. at Ex. A-12, ¶ 54; Ex. A-13, ¶ 51.  Dr. Go requested preauthorization for either a radiologist or himself to give the plaintiff a cortisone steroid injection under fluoroscopy for his left hip.  Id.

40.  Dr. Go left CMHIP before the steroid injection could be approved and performed. Id. at Ex. A-12, ¶ 55; Ex. A-13, ¶ 52.

41.  DOC medical providers can only refer patients to specialists who have a contract with the DOC.  Id. at Ex. A-13, ¶ 54.

42.  On May 15, 2006, Miller noted in the plaintiff's file that he was "seen by Dr. Go 03/15/06 who requested pre-auth[orization] for L hip injection secondary [to degenerative joint disease].  Dr. Go has left CMHIP and consult needs to be resubmitted for new ortho[pedic consultation]."  Id. at ¶ 53.  Miller was not aware in May 2006 of any radiologist under contract with the DOC who could perform injections under fluoroscopy.  Id. at Ex. A-13, ¶ 54.  She did, however, know that the DOC had a contract with Dr. DeGroote, an orthopedic specialist.  Id. Miller referred the plaintiff for a new orthopedic consultation on the same day.  Id. at ¶ 53.

43.  On July 28, 2006, the plaintiff was seen by Dr. DeGroote.  Id. at ¶ 56.  Dr. DeGroote requested further input from the physician treating the plaintiff's AIDS because of the increased possibility of immune depression and infection with an injection of the hip.  Id.  Dr. Degroote recommended that, in the interim, the plaintiff use a cane for ambulation and take anti-inflammatories.  Id.

44.  An x-ray of the plaintiff's pelvis and left hip, taken on July 28, 2006, showed no significant change from his previous examination of October 26, 2005.  Id. at Ex. A-12, ¶ 58.

45.  On July 31, 2006, Miller noted that CTCF had not received any documentation regarding the plaintiff's orthopedic consultation.  Id. at Ex. A-13, ¶ 57.  She requested a copy of the report and received it on August 18, 2006.  Id.

46.    On August 18, 2006, in response to Dr. DeGroote's recommendations, Miller submitted a request for the plaintiff's AIDS doctor, Dr. Richter, to evaluate the plaintiff for the hip injection.  Id. at ¶ 58.

47.    Dr. Richter approved the steroid injection on October 10, 2006.  Id. at ¶ 59.

48.    On October 31, 2006, the plaintiff was scheduled to have Dr. Wermers, a DOC physician, perform the steroid injection at CTCF.  Id. at ¶ 60.  Because Dr. Wermers was not trained to perform such an injection, the injection was not done that day.  Id.

49.    Miller left the DOC in November 2006.  Id. at ¶ 61.  At that time, the plaintiff had not yet received the cortisone steroid injection.  Id.

50.    On December 13, 2006, Nurse Practitioner Klenke submitted a referral for the plaintiff to see Dr. DeGroote for the steroid injection.  Id. at Ex. A-12, ¶ 65.

51.    On March 21, 2007, Dr. DeGroote performed the steroid injection.  Id. at ¶66.

52.    The Non-Formulary Committee denied another request by the plaintiff for Megestrol on July 30, 2006.  Id. at Ex. A-12, ¶ 69.  The request was denied because the plaintiff was at his ideal weight.  Id.  The plaintiff filed grievances regarding the denial.  Id.  In response to one of the grievances, defendant Harris stated that the DOC does not prescribe medication for weight control.  Id. at ¶ 70.  The statement was accurate as to the general DOC policy, but inaccurate as to the plaintiff because he had, at times, been prescribed Megestrol to help him gain weight due to his HIV/AIDS.  Id.  Harris did not attempt to deceive the plaintiff.  Id.  Harris has no involvement or control over the Non-Formulary Committee's decisions regarding approval or denial of non-formulary medication requests.  Id. at ¶ 71.

53.   On November 2, 2006, the plaintiff filed a Step 1 Grievance alleging that he had

been approved by the DOC's ADA Inmate Coordinator for a disability screening in May 2006,

but that no screening had yet occurred.  <u>Id.</u> at Ex. A-12, ¶ 72.  The grievance alleged that Harris

deliberately refused to schedule the plaintiff for a disability screening.  <u>Id.</u>  Harris has no

recollection of receiving the request; she is unable to find the request in the CTCF's record of

disability screening requests; and CTCF Clinical Services first learned of the plaintiff's request

for a screening when he submitted his grievance.  <u>Id.</u> at ¶¶ 74, 75, 77.  Harris did not deliberately

ignore any request for the plaintiff to receive a disability screening.  <u>Id.</u> at ¶ 76.

54.   The plaintiff was given a disability screening on November 7, 2006.  <u>Id.</u> at ¶ 77.  Dr.

Tim Creany concluded that the plaintiff was not disabled.  <u>Id.</u>

55.   Harris did not at any time retaliate against the plaintiff because of his lawsuits or

grievances.  <u>Id.</u> at ¶ 81.

56.   All of Miller's decisions regarding the plaintiff were based on her objective

evaluations of his medical needs.  <u>Id.</u> at Ex. A-13, ¶ 70.

## IV.  ANALYSIS

The defendants assert that they are entitled to qualified immunity on the plaintiff's claims

against them.  In general:

> Qualified immunity protects from litigation a public official whose
> possible violation of a plaintiff's civil rights was not clearly a
> violation at the time of the official's actions.  It is an entitlement
> not to stand trial or face the other burdens of litigation.  The
> privilege is an immunity from suit rather than a mere defense to
> liability.  When a defendant asserts the defense of qualified
> immunity, the burden shifts to the plaintiff to overcome the
> asserted immunity.  The plaintiff must first establish that the
> defendant's actions violated a constitutional or statutory right.  If
> the plaintiff establishes a violation of a constitutional or statutory

13

right, he must then demonstrate that the right at issue was clearly
established at the time of the defendant's unlawful conduct.

Ahmad v. Furlong, 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations

omitted).

The plaintiff bears a heavy two-part burden in establishing that the defendant violated

clearly established law.  Teague v. Overton, 15 Fed.Appx. 597, 600 (10th Cir. 2001).  This

burden must be met before the defendant bears his initial burden on summary judgment:

> A summary judgment decision involving the defense of qualified
> immunity is reviewed "somewhat differently" from other summary
> judgment rulings.  When a defendant raises the issue of qualified
> immunity, the plaintiff must satisfy a two-part test.  First, the
> plaintiff must demonstrate that the defendant's actions violated a
> constitutional or statutory right.  Second, the plaintiff must show
> that the constitutional or statutory right the defendant allegedly
> violated was clearly established at the time of the conduct at issue.
> A right is clearly established only if there is a Supreme Court or
> Tenth Circuit decision on point, or the clearly established weight
> of authority from other courts has found the law to be as the
> plaintiff maintains.  Only if the plaintiff establishes both elements
> of the test does the defendant bear the traditional burden of
> showing that there are no genuine issues of material fact and that
> he or she is entitled to judgment as a matter of law.

Scull v. New Mexico, 236 F.3d 588 (10th Cir. 2000) (internal quotations and citations omitted).

## A.   Claim One

Claim One alleges that the defendants violated the Eighth Amendment by denying and

delaying medical care as follows:

(1) Defendant Robinson would not issue the plaintiff a lower bunk restriction, would not

request that the plaintiff be moved to Cell House 3 where there are no top bunks, and did not

order the plaintiff to see an orthopedic specialist on June 12 and 29, 2005;

(2) Defendant Miller would not issue the plaintiff a lower bunk restriction, would not request that the plaintiff be moved to Cell House 3, did not order the plaintiff to see an orthopedic specialist, would not issue the plaintiff a second mattress and a lower bunk restriction as ordered by Dr. Go, and did not ensure that the plaintiff received a cortisone injection ordered by Dr. Go;

(3) Defendant Mayfield[2] would not order the plaintiff a lower bunk or a Cell House 3 assignment;

(4) Defendant Harris failed to help the plaintiff move to Cell House 3, give him a temporary lower bunk restriction until he could see an orthopedic doctor, put in an order to have him seen by an orthopedic doctor, ensure the plaintiff received all treatments ordered by Dr. Go, and ensure that the plaintiff received a medication called Megestrol;

(5) Defendant Foshee did not help the plaintiff obtain housing in Cell House 3 and did not order the plaintiff a lower bunk;

(6) Defendant Jaramillo did not help the plaintiff obtain housing in Cell House 3 and did not order the plaintiff a lower bunk;

(7) Defendant Tritz did not help the plaintiff obtain housing in Cell House 3 and did not order the plaintiff a lower bunk; and

(8) Defendant Abbott did not help the plaintiff obtain housing in Cell House 3 and did not order the plaintiff a lower bunk.

_____

[2]The Complaint lists as a defendant "Major Linda Mayfield."  The defendants spell her last name as "Maifeld."  Because there has been no formal request to change the spelling of her name, I refer to her as defendant Mayfield.

Claim One is based on the defendants' alleged indifference to the plaintiff's medical needs. A prison official's deliberate indifference to an inmate's serious medical needs violates the inmate's Eighth Amendment right to be free from cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." Id. at 104-05. To establish a claim for deliberate indifference, a plaintiff must prove both an objective component and a subjective component.

The objective component is met if the inmate's medical need is sufficiently serious. Farmer v. Brennan, 511 U.S. 825, 834 (1994). A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir.1999) (quoting Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)). The subjective component to a deliberate indifference claim is met if a prison official "knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.

**1. Lower Bunk**

Claim One alleges that all of the defendants were deliberately indifferent to the plaintiff's medical need for a lower bunk. The undisputed evidence demonstrates that the plaintiff's medical condition did not meet the DOC's objective criteria for a lower bunk restriction and that a lower bunk was not medically indicated for the plaintiff. It is further undisputed that the only reason Dr. Go recommended that the plaintiff be placed in a lower bunk was because the plaintiff

requested it. There is no evidence in the record to show that the plaintiff's need for a lower bunk was obvious or was mandated by a physician. Therefore, the plaintiff has not created a material fact dispute regarding the objective component of deliberate indifference, *i.e.*, whether his need for a lower bunk was sufficiently serious.

Moreover, the plaintiff has not set forth any evidence to create a material fact dispute regarding the subjective component of deliberate indifference. It is undisputed that the medical personnel responsible for assigning a lower bunk restriction believed that a lower bunk restriction was not medically necessary. There is no evidence to suggest that these individuals had any facts before them from which to draw an inference that denial of a lower bunk restriction would create a substantial risk of serious harm to the plaintiff.

Finally, an individual cannot be held liable in a section 1983 action unless he or she caused or participated in an alleged constitutional violation. McKee v. Heggy, 703 F.2d 479, 483 (10th Cir. 1983). Respondeat superior is not within the purview of section 1983 liability. Id. In order for a supervisor to be liable under section 1983, there must exist a causal connection or an affirmative link "between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." Butler v. City of Norman, 992 F.2d 1053, 1055 (10thCir. 1993); see also Rizzo v. Goode, 423 U.S. 362, 371 (1976). Without a showing of direct responsibility for the alleged violations, liability will not be imposed on a supervisory official. Id.

The plaintiff's claims against defendants Foshee, Mayfield, Jaramillo, Tritz, and Abbott are based solely on these defendants' failure to help him obtain a lower bunk. The undisputed facts establish that only Clinical Services personnel have the authority to determine whether an

inmate requires a medical housing restriction, and that defendants Foshee, Mayfield, Jaramillo, Tritz, and Abbott are non-medical staff.  Therefore, defendants Foshee, Mayfield, Jaramillo, Tritz, and Abbott did not personally participate in the alleged constitutional violation and cannot be held liable for it.

### 2. Cortisone Injection

Claim One also alleges that defendants Miller and Harris were deliberately indifferent to the plaintiff's medical needs because they did not ensure that the plaintiff received the cortisone injection ordered by Dr. Go.  The undisputed facts establish the following: (1) On March 15, 2006, Dr. Go requested preauthorization for either a radiologist or himself to administer a cortisone steroid injection into the plaintiff's left hip; (2) Dr. Go left CMHIP before the injection was approved; (3) DOC medical providers can refer patients only to specialists who have a contract with the DOC; (4) Miller referred the plaintiff for a new orthopedic consultation on May 15, 2006; (5) the plaintiff was seen by Dr. DeGroote on July 28, 2006; (6) Dr. DeGroote requested consultation from the doctor who was treating the plaintiff for HIV/AIDS because of the plaintiff's increased risk of immune depression and infection; (7) on July 31, 2006, Miller noted that CTCF did not receive any documentation regarding the plaintiff's visit with Dr. DeGroote and requested a copy of his report; (8) Miller received the report on August 18, 2006, and submitted a request on the same day to have plaintiff's AIDS doctor evaluate him; (9) the AIDS doctor approved the steroid injection on October 10, 2006; (10) Dr. Wermers declined to perform the injection on October 31, 2006; (11) Miller left the DOC in November 2006; (12) on December 13, 2006, Nurse Practitioner Klenke submitted a referral for the plaintiff to see Dr.

DeGroote for the steroid injection; and (13) on March 21, 2007, Dr. DeGroote performed the steroid injection.

There is no evidence in the record to establish that either Miller or Harris disregarded the order for the steroid injection or otherwise caused delay of the injection. To the contrary, the record establishes that the injection was delayed by the actions of the physicians.

Moreover, a "delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm." Oxendine v. R.G. Kaplan, M.D., 241 F.3d 1272, 1276 (10th Cir. 2001) (internal quotations and citation omitted). "Delays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical problems." Hunt, 199 F.3d at 1224. "Officials may also be held liable when the delay results in a lifelong handicap or a permanent loss." Id. "A difference of opinion as to the kind and timing of medical treatment does not rise to the level of an Eighth Amendment violation." Tyler v. Sullivan, 83 F.3d 433, 1996 WL 195295, at *2 (10th Cir. 1996).

There is no evidence in the record to establish that the delay in receiving the steroid injection caused the plaintiff substantial harm.

### 3. Referral to Orthopedic Specialist

Claim One alleges that Robinson, Miller, and Harris were deliberately indifferent to the plaintiff's medical needs because they did not refer him to see an orthopedic specialist after he requested to see one on June 12 and 29, 2005. The record establishes that Nurse Practitioner Batson referred the plaintiff to an orthopedic specialist on July 29, 2005, a month and a half after the plaintiff's request. The plaintiff has not set forth any evidence to show that Robinson,

Miller, or Harris were responsible for the delay or that the 1½ month delay resulted in substantial harm.

### 4. Megestrol

Claim One alleges that defendant Harris was deliberately indifferent to the plaintiff's medical needs because she failed to ensure that he received Megestrol, a medication to help with weight gain. However, it is undisputed that Harris is not authorized to approve or deny an order for Megestrol; this authority is vested in the DOC's Non-Formulary Committee.

### 5. Other Treatments Ordered by Dr. Go

Claim One alleges deliberate indifference based on Miller's failure to issue the plaintiff a second mattress as ordered by Dr. Go and Harris' failure to ensure he received all treatments ordered by Dr. Go. It is undisputed that on October 26, 2005, Dr. Go recommended that the plaintiff receive an MRI, physical therapy, a lower bunk, second mattress, and a follow up visit after completion of the MRI, and that on March 15, 2006, Dr. Go recommended a cortisone steroid injection. The lower bunk restriction and the cortisone injection have already been addressed.

The evidence establishes that the only reason Dr. Go ordered a second mattress is because the plaintiff requested it. There is no evidence in the record to show that the plaintiff had a medical need for a second mattress, or that the defendants were deliberately indifferent for not providing the plaintiff with a second mattress.

The record further demonstrates that the plaintiff received an MRI on December 19, 2005; physical therapy on December 22, 2005; and a follow up visit on March 15, 2006. There

is no evidence of any undue delay in receiving these recommended treatments, or of any substantial harm caused by a delay.

The plaintiff has failed to establish that the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment as alleged in Claim One. Therefore, I need not inquire whether his rights under the Eighth Amendment were clearly established, and the defendants are entitled to qualified immunity on Claim One.

## B. Claim Two

Claim Two alleges that defendants Harris and Miller retaliated against the plaintiff for filing this law suit. The plaintiff alleges that Miller retaliated against him when she required him to come to the clinic and charged him a $5.00 co-payment just to tell him that he had been referred to an orthopedic doctor; denied Dr. Go's orders for a second mattress and a lower bunk restriction; ordered Megestrol for the plaintiff on December 1, 2005, then removed the order from the computer; filed a false report against him for "Disobeying a Lawful Order"; failed to respond to a "kite" regarding herpes on the plaintiff's tongue; and failed to ensure that the plaintiff received the cortisone injection without delay.

The plaintiff alleges that Harris retaliated against him when she denied his grievances against Miller; denied a grievance regarding the cortisone injection; lied when denying a grievance regarding Megestrol; and held onto a memo sent to her on May 22, 2006 without scheduling plaintiff to be screened for mobility disability.

"Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his rights to access the courts." Smith v. Mashner, 899 F.2d 940, 947 (10th Cir. 1990). "This principle applies even if the action taken in retaliation would be otherwise

permissible." Id. at 948. An inmate, however, is not "inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he is engaged in protected activity." Peterson v. Shanks, 149 F.3d 1140,1144 (10th Cir. 1998). Therefore, to prevail on a claim of retaliation a plaintiff "must prove that but for the retaliatory motive, the incidents to which he refers . . . would not have taken place." Id. (quotations and citation omitted). "An inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." Id. (quotations and citation omitted) (emphasis in original).

The presentation of circumstantial evidence such as temporal proximity, a chronology of events, or suspicious timing may be sufficient to support allegations of retaliation. See Smith, 899 F.2d at 949 (holding that the inmate sufficiently supported retaliation claim with "only means available to him--circumstantial evidence of the suspicious timing of his discipline, coincidental transfers of his witnesses and assistants"); McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979) (holding that the plaintiff's allegations of a "chronology of events" may be read as "providing some support for an inference of retaliation"); Harris v. Fleming, 839 F.2d 1232, 1236-38 (7th Cir. 1988) (finding that the pattern and timing of firings and cell transfers were sufficient to establish a question of retaliation).

## 1. Charging $5.00 Co-Payment

The plaintiff alleges that Miller retaliated against him when she required him to come to the clinic and charged him a $5.00 co-payment just to tell him that he had been referred to an orthopedic doctor. He further alleges that Miller's actions occurred prior to October 5, 2005. *Complaint*, p 5.

The plaintiff initiated this case by filing his initial Complaint and a motion to proceed *in forma pauperis*. These papers were signed by the plaintiff on October 19, 2005. They were received by the Court and filed on October 21, 2005. Therefore, it is not possible that Miller's actions were in retaliation for filing this lawsuit.

### 2. Mattress, Lower Bunk Restriction, and Cortisone Injection

I have already determined that Miller and Harris did not wrongfully deny the plaintiff a second mattress, a lower bunk restriction, or a cortisone injection. Therefore, these actions cannot provide a basis for retaliation.

### 3. Megestrol Order

The plaintiff claims that Miller retaliated against him when she ordered Megestrol for the plaintiff and subsequently removed the order. He also claims that Harris retaliated against him when she lied when denying a grievance regarding Megestrol.

The undisputed facts establish that Miller and Harris were not involved in the Non-Formulary Committee's decisions to deny the plaintiff's Megestrol prescription, and that, although Harris inaccurately stated in a grievance response that the DOC did not prescribe medication for weight control, she did not attempt to deceive the plaintiff and did not at any time retaliate against him.

### 4. False Report for "Disobeying a Lawful Order"

The plaintiff alleges that Miller retaliated against him for filing a false report for "Disobeying a Lawful Order" and that he was later found not guilty of this charge. It is undisputed that the plaintiff's behavior on November 29, 2005, was disruptive and disrespectful. It is also undisputed that Miller and Correctional Officer Thompson submitted separate incident

reports about the plaintiff's behavior pursuant to DOC policy. Miller's actions merely subjected the plaintiff to normal conditions of confinement.

Moreover, Disciplinary Officer Fazzino made the decision to charge plaintiff with "Disobeying a Lawful Order." Miller did not have the authority to charge the plaintiff.

### 5. Failure to Respond to Kite Re: Herpes

The plaintiff alleges that Miller retaliated against him when she failed to respond to his kite regarding herpes on his tongue. Miller states that she has no recollection of receiving a kite from the plaintiff regarding an outbreak of herpes on the tongue. The plaintiff has not set forth any evidence to the contrary.

### 6. Denial of Grievances

The plaintiff claims that Harris retaliated against him when she denied the grievances he submitted against Miller for retaliation. The plaintiff has not shown that Miller retaliated against him. Therefore, denial of grievances complaining of retaliation by Miller cannot constitute a basis for retaliation.

### 7. Failure to Schedule a Disability Screening

The plaintiff claims that Harris retaliated against him when she failed to schedule him for a disability screening. The undisputed evidence establishes that Harris did not receive or deliberately ignore any request for the plaintiff to receive a disability screening.

The plaintiff has failed to establish that he was retaliated against in violation of his constitutional rights as alleged in Claim Two. Accordingly, I do not analyze whether his constitutional rights were clearly established, and the defendants are entitled to qualified immunity on Claim Two.

## V.  CONCLUSION

I respectfully RECOMMEND that the Motion be GRANTED and that summary judgment enter in favor of the defendants on all of the plaintiff's claims.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 10 days after service of this recommendation to serve and file specific, written objections.  A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000).  A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.  United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated November 21, 2008.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge